IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHARIS MOULE, On Behalf of Herself and All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No.: 10 C 3990 |
| BP CORPORATION NORTH AMERICA, INC., BP AMERICA, INC., BP p.l.c., BP CORPORATION NORTH AMERICA INC. SAVINGS PLAN INVESTMENT OVERSIGHT COMMITTEE, ANTHONY B. HAYWARD, LAMAR MCKAY, GREGORY T. WILLIAMSON, STEPHANIE C. ATKINS, RICHARD DORAZIL, NEIL SHAW, THOMAS L. TAYLOR, STATE STREET BANK AND TRUST and JOHN DOES 1-10, | ) ) ) ) ) ) ) ) ) ) ) ) | Judge Rebecca R. Pallmeyer

Magistrate Judge Susan Cox |
| Defendants. | ) | |

## <u>MOTION FOR A FINDING OF RELATEDNESS</u>

Plaintiff, by her counsel, requests that this Court make a finding pursuant to Local Rule 40.4, that the following action is related to this action which has been assigned to this Court, and in support, states:

1.      On June 28, 2010, Charis Moule ("*Moule*") commenced her complaint against defendants. A copy of the *Moule* class action complaint is attached as Exhibit A.

2.      On August 5, 2010, Plaintiff, Thomas P. Soesman (*"Soesman"*), commenced his class action, which was assigned to Judge Blanche M. Manning. A copy of the *Soesman* class action complaint is attached as Exhibit B.

3.      Both class action cases satisfy the definition of "Related" contained in LR4O.4(a)

5.     Both *Moule* and *Soesman* class actions arise from the Defendants' alleged breaches of their fiduciary obligations in violation of ERISA, and both cases involve the same issues of fact. Coordination of *Soesman* with the *Moule* action will greatly facilitate resolution of the claims alleged in the class actions. LR4O.4(a)(2 and 3).

6.     *Moule* and *Soesman* allege the same Class Period.

7.     *Soesman* is also substantially similar to the other ERISA class actions that this Court has found to be related to *Moule* and it is the undersigned's understanding that Defendants do not object to this Court finding that *Soesman* is related to *Moule*.

## LR4O.4(b) Requirements are Satisfied

8.     Both actions are pending in this court. LR4O.4(b)(l).

9.     Plaintiffs in the class action cases believe that judicial economy will be promoted by relating these actions so that there will not be a duplication of motion practice, discovery and effort in pre-trial proceedings and possible inconsistent rulings on similar issues. LR4O.4(b)(2).

10.     Also, since Defendants' alleged misconduct bearing on Plaintiffs' claims is substantially the same in both of the class action cases and because none of the actions has progressed to the point where designating these cases as related would likely delay the proceedings in this earlier filed action, the handling and management of the actions by the same judge is likely to result in a substantial saving of judicial time and effort. LR4O.4(b)(3).

11.     Neither *Moule* nor *Soesman* requested trial by jury. Therefore, both class cases are susceptible of disposition in a single proceeding. LR4O.4(b)(4).

12.     The class actions can also be consolidated pursuant to F.R.Civ.P. 42(a).

13.     Both class actions name substantially the same defendants.

14.     Both class actions are susceptible to a single trial with the *Moule* action, arise

from the same common core of Defendants' wrongful conduct, and there are substantial

pre-trial proceedings which can and should be coordinated and accomplished such that the class

actions are related.

WHEREFORE, Plaintiff requests this Court to make a finding pursuant to Local Rule

40.4 that the *Soesman* class action is related to the *Moule* action.

Dated: August 17, 2010                    Respectfully submitted,

By:  */s/ Marvin A. Miller*
Marvin A. Miller
Matthew E. Van Tine
**MILLER LAW LLC**
115 S. LaSalle Street
Suite 2910
Chicago, IL  60603
Tel:  (312) 332-2400

W. Mark Lanier
Evan M. Janush
**THE LANIER LAW FIRM**
6810 FM 1960 West
Houston, TX  77069
Tel: (713) 659-5200

Sanford P. Dumain
Lori G. Feldman
Arvind Khurana
**MILBERG LLP**
One Pennsylvania Plaza
New York, NY  10119
Tel:  (212) 594-5300

Robert I. Harwood
Jeffrey Norton
**HARWOOD FEFFER LLP**
488 Madison Avenue
New York, NY 10022-5725
Tel:  (212) 935-7400

***Counsel for Plaintiff***

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CHARIS MOULE, On Behalf of Herself and All Others Similarly Situated,<br><br>                   Plaintiff,<br><br>   vs.<br><br>BP CORPORATION NORTH AMERICA, INC., BP AMERICA, INC., BP p.l.c., BP CORPORATION NORTH AMERICA INC. SAVINGS PLAN INVESTMENT OVERSIGHT COMMITTEE, ANTHONY B. HAYWARD, LAMAR MCKAY, GREGORY T. WILLIAMSON, STEPHANIE C. ATKINS, RICHARD DORAZIL, NEIL SHAW, THOMAS L. TAYLOR, STATE STREET BANK AND TRUST and JOHN DOES 1-10,<br><br>                 Defendants. | No.: |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE**
**RETIREMENT INCOME SECURITY ACT OF 1974**

Plaintiff Charis Moule ("Plaintiff"), individually, as a representative of the BP Employee

Savings Plan (the "ESP" or "Plan"), and on behalf of a class of similarly situated participants in

and beneficiaries of the Plan (collectively, the "Participants"), by her attorneys, alleges the

following for her Complaint (the "Complaint"):

**INTRODUCTION**

1.     Plaintiff brings this as a class action on behalf of the ESP and on behalf of all

Participants of the ESP between October 30, 2009, and the present (the "Class Period") pursuant

to §§ 502(a)(2) and (3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29

U.S.C. §§ 1132(a)(2) and (3), against the ESP's fiduciaries.  Plaintiff's claims apply to the Participants of the ESP as a whole.  ERISA authorizes participants such as Plaintiff to sue for breaches of fiduciary duty on behalf of the ESP.

2.     Defendants, as fiduciaries of the ESP, breached their duties to the ESP and the Participants in violation of ERISA, particularly with regard to the Plan's holdings of billions of dollars of American Depositary Shares ("ADSs") in BP p.l.c.  Defendants knew or should have known that investment in BP p.l.c. equity was -- and continues to be -- an imprudent investment of the ESP's assets due to serious mismanagement and improper business practices that resulted in catastrophic incidents of international significance including, among others, the BP oil spill in the Gulf of Mexico.

**JURISDICTION AND VENUE**

3.     **Subject Matter Jurisdiction**.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

4.     **Personal Jurisdiction**.  ERISA provides for nation-wide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  As all Defendants are either residents of the United States or subject to service in the United States, this Court has personal jurisdiction over them.

5.     **Venue**.  Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the Defendants reside or maintain their primary place of business in this District, and some or all of the fiduciary breaches for which relief is sought occurred in this District.

**PARTIES**

**Plaintiff**

6.     Plaintiff Moule is a resident of Florida.  She is a participant in the ESP, within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1132(a).  During the Class

Period, the ESP purchased or maintained units of the BP Stock Fund for Plaintiff Moule's individual plan account.

**Defendants**

7.      BP Corporation North America, Inc. and BP America, Inc. are subsidiaries of BP p.l.c.  BP Corporation North America, Inc. has its headquarters in Warrenville, Illinois.  BP America, Inc. has its principal place of business in Warrenville, Illinois.  BP Corporation North America, Inc. and BP America, Inc. and their respective subsidiaries are collectively referenced herein as "BP."  BP is the sponsor of the Plan, a defined contribution plan governed by ERISA for the benefit of certain U.S. employees of BP.

8.      BP p.l.c., a United Kingdom-based company, is one of the world's largest energy companies, with extensive contacts in the U.S.  It is the largest producer of oil and gas offshore in the deepwater Gulf of Mexico.  Its onshore gas operations enabled the company to become one of the largest gas producers in the U.S.  BP p.l.c. operates tens of thousands of miles of pipelines in the U.S., has several refineries in the U.S., and is the second-largest gasoline marketer in the U.S.  BP p.l.c. has approximately 29,000 employees in the U.S., one-third of its total worldwide employees.

9.      Upon information and belief, BP and BP p.l.c., at all times, acted through their officers, directors and employees, and members of committees who were appointed to perform Plan-related fiduciary functions, and did so in the course and scope of their services for the companies.

10.     Anthony B. Hayward ("Hayward") is the Chief Executive Officer of BP p.l.c. and a member of its Board of Directors.  Hayward also serves as Chief Executive of Defendant BP America, Inc.

11.     Upon information and belief, Defendant BP Corporation North America Inc. Savings Plan Investment Oversight Committee (the "Savings Plan Committee") is a named fiduciary of the ESP.

12.     Lamar McKay ("McKay") served as a member of the Savings Plan Committee during the Class Period.  McKay is currently the Chairman and President of BP America Inc. and Chief Representative of BP p.l.c. in the United States.  According to McKay's testimony before Congress on May 11, 2010, he is "BP's lead representative in the U.S. and [is] responsible for broad oversight and connectivity across all of [BP's] U.S. based businesses."  Defendant McKay testified before Congress again on June 15, 2010, concerning BP's efforts and his role in cleaning up the oil spill in the Gulf of Mexico.

13.     Gregory T. Williamson ("Williamson") served as the Director of Trust Investments for BP America, Inc., the parent company of BP Corporation North America Inc. during the Class Period.  Williamson also served as the Secretary and a member of the Savings Plan Committee during the Class Period.

14.     Stephanie C. Atkins ("Atkins") served as a member of the Savings Plan Committee during the Class Period.  Atkins also served as the Vice President Human Resources WY Operations and SAP Development during the Class Period.

15.     Richard Dorazil ("Dorazil") served as a member of the Savings Plan Committee during the Class Period.  Dorazil also served as the Vice President, Total Rewards, Western Hemisphere BP America at Washington.  Defendant Dorazil signed BP p.l.c.'s Forms 11-K filed with the U.S. Securities and Exchange Commission ("SEC") during the Class Period in his capacity as the Plan Administrator.

16.     Neil Shaw ("Shaw") served as a member of the Savings Plan Committee during the Class Period.  Shaw also served as a Strategic Performance Unit Leader during the Class Period.  Shaw was in charge of BP's Gulf of Mexico division.

17.     Thomas L. Taylor ("Taylor") served as a member of the Savings Plan Committee during the Class Period.

18.     Savings Plan Committee, Williamson, Atkins, Dorazil, McKay, Shaw and Taylor are collectively referenced herein as the "Savings Plan Committee Defendants."

19.     State Street Global Advisors, the investment management arm of State Street Bank and Trust Company ("SSBT") served as the Investment Manager of the BP Stock Fund.  SSBT maintains offices in Illinois.  SSBT was the trustee of the ESP during the Class Period.

20.     Defendants John Does 1-10 are additional BP and/or BP p.l.c. officers, directors, employees, and members of any Board committees, subcommittees or other BP committees, who were fiduciaries of the ESP during the Class Period, and whose identities are presently unknown to Plaintiff.  Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

## THE PLAN

21.     The ESP is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) and a defined contribution plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

22.     The Plan is a legal entity that can sue or be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the ESP is neither a plaintiff nor a defendant.  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the ESP.  Plaintiff seeks plan-wide relief.

23.     According to the 2009 Form 11-K filed with the SEC on June 16, 2010, the purpose of the ESP is to "encourage eligible employees to regularly save part of their earnings and to assist them in accumulating additional financial security for their retirement."

24.     Fidelity Investments Institutional Services Company, Inc. is the record keeper for the ESP.

25.     Dorazil, the Company's Vice President-HR Total Rewards, Western Hemisphere is the Plan Administrator.

26.     The assets of the ESP are held by the BP Master Trust for Employee Savings Plan (the "Master Trust").

27.     BP's full-time, part-time, occasional, or temporary employees are eligible to participate in the ESP.  BP's employees may enroll in the ESP immediately after their date of hire.

28.     Participants of the ESP may contribute up to 80% (100% prior to May 1, 2009) of their qualified pay, subject to statutory limits.

29.     Participants of the ESP may elect to direct their employee contributions to any of the investment options offered by the ESP.  According to the August 2009 Update #3 to the August 2008 Investment Options Guide, the investment options are separated into three tiers. Tier I consists of Target Date Funds.  The investment options in Tier II represent major asset classes - stocks, bonds and short-term investments.  Tier III is a unitized fund comprised of BP ADSs (the BP Stock Fund) and cash to facilitate daily transactions.

30.     The BP Stock Fund consists almost entirely of BP ADSs. The BP Stock Fund seeks to match the investment return of BP ADSs.  A BP ADS is a security created to allow easier holding and trading of equity interests in BP p.l.c. in the United States.  Each BP ADS

represents six BP p.l.c. ordinary shares.  BP ADSs are traded on the New York Stock Exchange.

JP MorganChase Bank is the depositary of the BP ADSs.

31.     According to the 2009 Summary Plan Description, BP makes a company-matching contribution equal to 100% of every dollar contributed by Participants (excluding rollover contributions), up to 7% of Participants' eligible pay each pay period.

32.     According to the 2009 11-K for fiscal year 2009, the Master Trust held $2.45 billion worth of BP ADSs, or 29% of total Master Trust assets, $8.27 billion, at the end of the 2009.

33.     Defendants, as Plan fiduciaries, were required by ERISA to furnish information to Participants.  ERISA § 101, 29 U.S.C. § 1021, requires the Plan administrator to furnish Summary Plan Descriptions (SPDs) to Participants.  The Plan document, the SPD and the ESP's Investment Options Guide (and updates), a supplement to the SPD in effect during the Class Period, incorporates by reference certain information filed with the SEC by BP p.l.c., thereby making such SEC filings fiduciary communications with the Participants.

## DEFENDANTS ARE FIDUCIARIES OF THE ESP

34.     During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the ESP and/or management or disposition of the ESP's assets.

35.     ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A). The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).  The administrator of the ESP is the Senior Vice President-Human Resources or an Applicable Named Fiduciary who is identified as an Administrator.  The Plan also provides that

a Fiduciary is (a) any individual or entity that a Designated Officer (Senior Vice President and any other officer of BP, the Group Vice President, Human Resources of B.P. p.l.c. and any other officer of BP p.l.c.) identifies to be an Administrative Named Fiduciary with respect to such individual's or entity's authority to control and manage the operation and administration of the ESP and (b) any individual or entity that an Administrative Named Fiduciary, acting on behalf of the ESP, designates to be a Fiduciary.

36.     ERISA treats as fiduciaries all persons explicitly named as fiduciaries under ERISA § 402(a)(1), and any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent he or she "(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).  During the Class Period, all of the Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

37.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the ESP, and the ESP's investments solely in the interest of the Participants and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

38.     Instead of delegating all fiduciary responsibility for the ESP to external service providers, BP chose to internalize at least some of these fiduciary functions.

8

39.     During the Class Period, all of the Defendants acted as fiduciaries of the ESP pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

**Defendant BP**

40.     BP was a fiduciary of the ESP because it exercised discretionary authority or discretionary responsibility in the administration of the ESP, exercised discretionary authority or control with respect to the management of the ESP's assets, exercised discretionary authority or control with respect to the management of the BP Stock Fund, and exercised discretionary authority and control with respect to the appointment of other Plan fiduciaries during the Class Period.  Upon information and belief, BP exercised this control.

41.     BP was responsible for communicating with Participants regarding the ESP, and providing Participants with information and materials required by ERISA. BP drafted and disseminated various documents and materials related to the ESP, including but not limited to, the summary plan descriptions and the documents incorporated into the summary plan descriptions.

42.     BP was a Plan fiduciary because it had the discretion and authority to direct the liquidation of the BP Stock Fund if it independently determined that it was no longer a prudent investment.

43.     BP was a Plan fiduciary to the extent it exercised its authority to select, monitor, retain, and remove the administrator and/or fiduciaries and members of any committees or other individuals charged with the administration of the ESP and, accordingly, exercised authority and oversight over the administrator and/or fiduciaries and such committees, which reported to the Board of Directors of BP regarding their fiduciary duties and responsibilities to the ESP and with respect to their actions pertaining to the same.

44.     BP was imputed with the knowledge that its officers and employees had of the misconduct alleged herein, even if not communicated to BP, and BP is liable for these actions.

**BP p.l.c.**

45.     The Plan also provides that a Fiduciary is (a) any individual or entity that a Designated Officer (Senior Vice President and any other officer of BP, the Group Vice President, Human Resources of B.P. p.l.c. and any other officer of BP p.l.c.) identifies to be an Administrative Named Fiduciary with respect to such individual's or entity's authority to control and manage the operation and administration of the ESP and (b) any individual or entity that an Administrative Named Fiduciary, acting on behalf of the ESP, designates to be a Fiduciary.

46.     According to BP p.l.c.'s Annual Report and Accounts 2009, BP p.l.c.'s audit committee reviewed risk management and investment strategy related to pensions and other post-retirement benefits.

47.     Accordingly, BP p.l.c. was a Plan fiduciary to the extent it exercised its authority to select, monitor, retain, and remove the administrator and/or fiduciaries and members of any committees or other individuals charged with the administration of the ESP and, accordingly, exercised authority and oversight over the administrator and/or fiduciaries and such committees, which reported to the Board of Directors of BP regarding their fiduciary duties and responsibilities to the ESP and with respect to their actions pertaining to the same.

**Hayward**

48.     Hayward was a Plan fiduciary to the extent he exercised BP p.l.c.'s authority under the Plan to identify an Administrative Named Fiduciary with respect to such individual's or entity's authority to control and manage the operation and administration of the ESP.

49.     Additionally, Hayward acted as a Plan fiduciary by communicating regularly and directly with employees regarding the financial health of BP and the security of their retirement

savings despite his knowledge of and direct involvement in BP's risky and dangerous operations and business decisions that put BP as well as the Participants' Plan investment at substantial risk. Despite the plummeting value of BP ADSs during the Class Period, in no small measure due to Hayward's own actions, Hayward continued erroneously to encourage employees that their retirement savings were not in peril.

**SSBT and the Savings Plan Committee Defendants**

50.     According to the ESP's Investment Options Guide that was disseminated to Participants, the Investment Manager for the BP Stock Fund, "may attempt to liquidate all the BP ADSs in the BP Stock Fund should the investment manager **or** BP determine such an investment is no longer prudent."  (Emphasis added.)

51.     During the Class Period, SSBT was a fiduciary of the ESP because it had independent discretion and authority to liquidate the BP Stock Fund.

52.     Upon information and belief, the Savings Plan Committee Defendants have the authority to direct the investment management of the ESP funds, including the authority to hire investment managers to manage the funds.

53.     According to the terms of the ESP, an "Applicable Named Fiduciary" is, with respect to any authority, control or discretion in the operation, administration, or management of the ESP or Trust, the Administrative Named Fiduciary who is charged with, or who exercises responsibility for, such matter.

54.     Upon information and belief, the Savings Plan Committee Defendants and SSBT as the investment manager of the BP Stock Fund, were charged with designating investment funds for the ESP, establishing rules and procedures with respect to the ESP's investment funds and monitoring the performance of the ESP's investments.  Upon information and belief, the Savings Plan Committee Defendants and SSBT were appointed by BP and BP p.l.c.  Upon

information and belief, the Savings Plan Committee Defendants and SSBT were fiduciaries of the ESP within the meaning of ERISA in that they exercised discretionary authority and discretionary control with respect to the ESP's management, administration, investments, and assets.

55.     Upon information and belief, the ESP and its assets are administered and managed by the Savings Plan Committee Defendants and SSBT, selected and monitored by BP. Upon information and belief, the Savings Plan Committee Defendants and SSBT exercised broad responsibility for management and administration of the ESP and, among their other duties, were responsible for oversight of the ESP's investment options, policies, and the performance of the ESP's investments, as well as the review of investment managers.

56.     The Savings Plan Committee Defendants and SSBT communicated with Participants regarding the ESP, and provided Participants with information and materials required by ERISA.  In this regard, on behalf of BP, the Savings Plan Committee Defendants and SSBT disseminated Plan documents and materials.

## CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action as a class action in the event that class action procedures are deemed necessary by the Court, pursuant to Rules 23(a), (b)(1), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plaintiff and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the ESP at any time during the Class Period, between October 30, 2009 and the present, whose accounts included units of the BP Stock Fund. Excluded from the Class are Defendants and members of the Defendants' Immediate Families,, any entity in which a Defendant has a controlling interest, and their heirs, Successors-In-Interest, or assigns (in their capacities as heirs, Successors-In-Interest, or assigns).

58.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of members of the Class is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class who participated in or were beneficiaries of the ESP during the Class Period.

59.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

        (a)     whether Defendants each owed a fiduciary duty to Plaintiff and other Class members;

        (b)     whether Defendants breached their fiduciary duties to Plaintiff and other Class members by failing to act prudently and solely in the interests of Participants;

        (c)     whether Defendants violated ERISA; and

        (d)     whether the Class members have sustained damages and, if so, the proper measure of those damages.

60.     Plaintiff's claims are typical of the claims of the other members of the class because Plaintiff and the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

61.     Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

62.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of

adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

63.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

64.     In the alternative, if the Court determines that class certification is not necessary and/or not appropriate, Plaintiff requests that the Court recognize Plaintiff's legal right to obtain complete recovery for the entire Plan for the fiduciary violations alleged in this Complaint pursuant to ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2).  Section 502(a)(2) states that "[a] civil action may be brought . . . by a participant . . . for appropriate relief under section 1109 of this title. . . ."  ERISA Section 409(a), 29 U.S.C. § 1109(a), states:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable *to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary*, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

(Emphasis added.)

**FACTS BEARING ON DEFENDANTS' FIDUCIARY BREACHES**

65.     As a consequence of BP's inadequate safety measures in place for its oil and gas operations and the resulting devastating effect this could have on the BP Stock Fund in the ESP, Defendants knew of or should have known that BP ADSs were an imprudent investment for the ESP.  Defendants failed to protect the Participants' retirement savings from being imprudently invested in the BP Stock Fund, and as a result, the ESP suffered losses, for which the Defendants are liable.

66.     On October 30, 2009, the first day of the Class Period, BP was fined $87 million for "outstanding life threatening safety problems" in connection with a March 23, 2005, accident at the BP Texas City Refinery that left 15 workers dead and 170 injured.  Hilda Solis, the Secretary of the Department of Labor, stated that there still existed 439 "willful and egregious safety violations" that could result in another catastrophic accident.  Jordan Barab, an assistant secretary at OSHA stated, "Just the fact that there are still so many outstanding problems, life-threatening problems, at this plant, indicates that they still have a systemic safety problem."  BP claimed that it would clean up its safety record.  However, they have not done so.  Rather, such systemic safety problems have resulted in the current catastrophic oil spill in the Gulf of Mexico.

67.     The U.S. Chemical and Safety Hazard Investigation Board ("CSB") investigated BP's safety performance at Texas City as well as the role played by BP management in the explosion.  According to the CSB's report, the disaster was caused by organizational and safety deficiencies at all levels of BP p.l.c.  In September 2005, BP Products North America, a subsidiary of BP, settled with the Occupational Safety and Health Administration for the Texas refinery accident for $21.4 million.  This represented the largest industrial accident settlement of its kind.  On December 9, 2005, BP vowed to spend $1 billion over the next five years to enhance safety.  On March 23, 2006, news emerged that a document written in 2005, weeks

before the Texas City explosion, showed that Company officers feared that safety violations would lead to deaths at the Texas plant.  In January 2007, an independent panel reviewing BP's safety found that faulty safety practices caused the Texas City disaster, that cost cutting and maintenance cutting had been severe, that profits took precedence over safety and that the company had not established a trusting environment and as a result, prior warnings about the plant's safety went unheeded.  The report also provided a series of suggestions on safety.

68.     On March 2, 2006, less than one year after the Texas City disaster, BP discovered a leak in a pipeline in the Western Operating Area of the Prudhoe Bay in Alaska (and also the largest oil field in the U.S.) which caused a spill of more than 200,000 gallons of oil.  On October 25, 2007, BP subsidiary BP Exploration Alaska Inc. pled guilty to a criminal violation of the Clean Water Act and was sentenced to three years' probation.  A Congressional committee later determined that BP p.l.c. had ignored opportunities to prevent the spill and that "draconian" cost-saving measures had led to shortcuts in its operations. The Prudhoe Bay incident and the Texas City disaster led to the resignation of John Browne, BP's former CEO.  BP p.l.c. promised again that it would change and improve its safety.

69.     In BP p.l.c.'s 2007 SEC Form 20-F, BP p.l.c. stated, "throughout 2007, BP continued to progress the process safety enhancement programme initiated in response to the March 2005 incident at the Texas City refinery.  We worked to implement the recommendations of the BP US Refineries Independent Safety Review Panel (the panel), which issued its report on the incident in January 2007. . .  We have made material progress throughout the group across all of the panels 10 recommendations."  (emphasis added).

70.     When Hayward took office as chief executive officer in 2007, he promised to change BP p.l.c.'s culture, with a renewed commitment to safety.  Hayward represented that his

first priority was "focusing like a laser on safe and reliable operations."  Subsequent events belied Hayward's purported commitment to safety, as BP p.l.c. has expanded its underwater drilling operations across the globe coupled with severe cost-cutting measures. While aggressively seeking to grow and expand, BP p.l.c. was also implementing methods of keeping costs down, including failing to provide adequate safety measures for BP's oil and gas exploration operations.

71.     In March 2009, BP identified operations in the Gulf of Mexico as one of its primary economic drivers, highlighting the fact that it was one of the largest deepwater operators in the world. At the same time, BP failed to disclose that its Gulf of Mexico operations were exceedingly risky and that it had deficient safety protocols in place to deal with potential disasters.

72.     In its 2009 Annual Form 20-F, filed on March 5, 2010, BP p.l.c. stated in a section entitled "Safety" that "Good progress is being made on underpinning improved safety performance in 2009. Throughout the year, we continued to focus on training and enhancing procedures across the organization" and touted the "continued success of our Gulf of Mexico deepwater operations."

73.     On November 19, 2009, David Rainey, Vice President for Gulf of Mexico Exploration for BP appeared before the Senate Energy and Natural Resources Committee, and stated that advances in technology had enabled the industry to reduce the occurrence of oil spills and other environmental consequences of offshore drilling.  Rainey also stated that developments over the last 50 years have made it easier to protect the environment. While Rainey acknowledged the general risks of drilling for oil in the Gulf of Mexico, he omitted the material

fact that BP had not implemented adequate safety provisions, and therefore was highly exposed to operational risks in the Gulf of Mexico.

74.     Rainey also provided a written statement to the Senate Energy and Natural Resources Committee.  In discussing safety specifically, Rainey stated: "While our intent is to prevent all accidental discharges, we conduct regular emergency drills with local, state, and federal agencies. All of our production facilities have contingency plans that identify the procedures, response equipment, and key personnel needed for responding to incidents."

75.     On February 26, 2010, BP p.l.c. issued its 2009 Annual Review. The Annual Review included a letter from Chairman of the Board Carl-Henric Svanberg, stating "Risk remains a key issue for every business, but at BP it is fundamental to what we do.  We operate at the frontiers of the energy industry, in an environment where attitude to risk is key.  The countries we work in, the technical and physical challenges we take on and the investments we make - these all demand a sharp focus on how we manage risk.  We must never shrink from taking on difficult challenges, but the board will strive to set expectations of how risk is managed and remain vigilant on oversight."

76.     In reality, however, BP and BP p.l.c. were sacrificing the management of risk in order to maximize profits, meaning that it was prepared to put its employees, the public and the environment at substantial risk in order to save money on such items as a back-up blowout preventer at the *Deepwater Horizon*.

77.     In the 2009 Annual Review, Hayward wrote, "Despite these difficult conditions, a revitalized BP kept up its momentum and delivered strong operating and financial results while continuing to focus on safe and reliable operations."

78.     Hayward went on to tout BP p.l.c.'s Gulf of Mexico operations stating that BP is "the largest producer and leading resource holder in the deepwater Gulf of Mexico."  Hayward reassured investors that risks were being handled appropriately.  He stated, "BP has always operated at the frontiers of the energy industry and our core strengths are more relevant and valuable than ever. BP's experience, skills, capability, technology and access to markets enable resource holders to maximize returns over the long term. We continue to show our ability to take on and manage risk, doing the difficult things that others either can't do or with governments and national oil companies and why we continue to have a critical role to play in supplying the world with its future energy needs."

**The *Deepwater Horizon* Disaster**

79.     BP p.l.c. is the holder of a lease that allows BP to drill for oil and perform oil production-related operations at the Macondo well site in the Mississippi Canyon 252 section of the outer continental shelf in the Gulf of Mexico close to the states of Louisiana, Mississippi, Alabama and Florida.  The *Deepwater Horizon*, a mobile offshore drilling unit owned and built by Transocean, had been chartered by BP and completion operations of the well were directed by BP. As the operator of the well that the *Deepwater Horizon* had drilled, BP was ultimately responsible for ensuring that appropriate safety protocols were implemented and followed.

80.     BP was aware of or should have known that drilling at the depths that the *Deepwater Horizon* was drilling posed increased risks.  BP knew or should have known that in the Gulf of Mexico it was appropriate to spend more money and adopt stricter safety procedures because of the heightened risks and dangers.  BP, however, chose to ignore such risks in order to cut costs while assuring the Participants and public that its Gulf of Mexico operations were maintained and operated with the utmost adherence to safety.

81.     On the evening of April 20, 2010, an explosion erupted on the *Deepwater Horizon*.  Two days after the explosion, on April 22, 2010, the *Deepwater Horizon* sank and began discharging oil into the Gulf of Mexico. Eleven workers died because of the *Deepwater Horizon* explosion and to this day, BP has yet to stop the leaking of crude oil into the Gulf of Mexico.

82.     The *Deepwater Horizon* was connected to the wellhead on the seal floor by a 5,000-foot pipe called a riser.  As the *Deepwater Horizon* sank to the bottom, it pulled the riser down with it, bending and breaking the pipe before finally tearing away from it completely. The riser bent into a crooked shape underwater, and now snakes along the ocean floor and in the deepest waters slightly above it. Oil was leaking from the open end of the riser and from three places along its length.

83.     According to a preliminary analysis, bad wiring and a leak in what is supposed to be a "blowout preventer" may have contributed to the explosion. Sealing problems may have allowed a methane eruption.  Even a dead battery may have been part of the cause of the incident. Congressional investigators revealed on May 12, 2010, that a key safety system, known as the blowout preventer, used in BP's oil-drilling rig in the Gulf had a hydraulic leak and a failed battery that probably prevented it from working as designed.  Based on new disclosures, it was revealed that a complicated cascade of deep-sea equipment failures and procedural problems played a major role in the oil rig explosion and massive spill that is still fouling the waters of the Gulf of Mexico and threatening industries and wildlife near the coast and on shore. All of these problems were the result of BP p.l.c.'s failure to adhere to safety procedures.

84.     BP p.l.c. told the House Energy and Commerce Subcommittee on Oversight that the well that exploded had failed a key pressure test hours before the April 20, 2010, explosion.

According to Steven Newman, president of Transocean, and McKay, these pressure readings were worrisome. Despite these worrisome pressure readings, the companies did not suspend operations.

85. Workers on the *Deepwater Horizon* told BP p.l.c. internal investigators in interviews that the blowout was triggered by a bubble of methane gas that escaped from the drilling well and shot up the drill column. The bubble expanded quickly after it escaped from the drilling well and burst through several seals and barriers before exploding.

86. After the explosion, BP attempted to downplay and conceal the severity of the oil spill. An initial leak estimate of 1,000 barrels (42,000 gallon) per day was found by government investigators to be a fraction of the actual leak amount of 5,000 barrels (200,000 gallons) per day. Moreover, BP p.l.c. was slow and incomplete in its announcements and warnings to Gulf Coast residents and businesspeople about the severity, forecast, and trajectory of the oil spill.

87. While BP had initially tried to convince the public that the *Deepwater Horizon* was discharging only 1,000 barrels a day into the oil, the evidence soon forced them to change their estimates to approximately 5,000 barrels of oil a day. In a worst case scenario, experts estimated that the *Deepwater Horizon* was discharging up to 60,000 barrels of oil a day.

88. BP has struggled to develop containment systems for the crude oil leaking into the Gulf of Mexico. On May 10, 2010, BP p.l.c. Chief Operating Officer Doug Suttles admitted that BP was woefully unprepared to mitigate the damage of the *Deepwater Horizon* incident due to its location. Suttles stated, "There's a lot of techniques available to us. The challenge with all of them is, as you said, they haven't been done in 5,000 feet of water."

89. Defendants knew of should have known that there was a high probability that something of this magnitude could occur. On June 14, 2010, the U.S. Congressional

Subcommittee on Oversight and Investigations sent a letter to Hayward detailing serious

questions about the decisions made by BP in the days and hours before the explosion on the

*Deepwater Horizon*.  The letter states in part:

> On April 15, **five days before the explosion, BP's drilling
> engineer called Macondo a "nightmare well."**  In spite of the
> well's difficulties, BP appears to have made multiple decisions for
> economic reasons that increased the danger of a catastrophic well
> failure.  In several instances, these decisions appear to violate
> industry guidelines and were made despite warnings from BP's
> own personnel and its contractors.  In effect, it appears that BP
> repeatedly chose risky procedures in order to reduce costs and save
> time and made minimal efforts to contain the added risk.
>
> At the time of the blowout, the Macondo well was significantly
> behind schedule. This appears to have created pressure to take
> shortcuts to speed finishing the well. In particular, the Committee
> is focusing on five crucial decisions made by BP: (1) the decision
> to use a well design with few barriers to gas flow; (2) the failure to
> use a sufficient number of "centralizers" to prevent channeling
> during the cement process; (3) the failure to run a cement bond log
> to evaluate the effectiveness of the cement job; (4) the failure to
> circulate potentially gas-bearing drilling muds out of the well; and
> (5) the failure to secure the wellhead with a lockdown sleeve
> before allowing pressure on the seal from below. The common
> feature of these five decisions is that they posed a trade-off
> between cost and well safety.  (Emphasis added.)

90.    According to one of the survivors of the *Deepwater Horizon*, BP had known

about potential problems on the *Deepwater Horizon* for months prior to the accident.  The

survivor informed *60 Minutes* that BP had initially estimated work to take 21 days.  However, as

the time for setting up the latest well extended to six weeks, BP management became agitated

and ordered workers to speed up the schedule.  An earlier problem with the well had cost BP an

extra $25 million.  BP management pressured the workers on the oil rig in order to make up that

loss.  The *Deepwater Horizon* survivor told 60 Minutes that BP was continuously pressuring

them to work quickly, however when the timeline for drilling the Macondo well got delay

coupled with the loss of $25 million in an earlier incident, BP managers ordered the drillers to speed up the rate of penetration.

91.    Approximately four-to-five weeks prior to the *Deepwater Horizon* incident, chunks of the annular on the blowout preventer had broken off and floated to the surface. The annular is a critical part of the blowout preventer used to ensure that explosive gas does not escape to the surface. BP also knew in the weeks and months prior to the incident that the battery on the blowout preventer was weak and one of the control pods on the blowout preventer was broken.  According to an engineering expert, Robert Bea, the malfunctioning control pod is "like losing one of your legs."  Not only did the blowout preventer on the *Deepwater Horizon* fail to stop the flow immediately after the explosion on the evening of April 20th, but repeated attempts to engage the blowout preventer in the days and weeks that followed similarly have been to no avail.

92.    On June 19, 2010, in an article entitled "BP Relied on Cheaper Wells," the Wall Street Journal reported that its analysis showed how BP regularly employed "risky" long string design well designs that skimped on industry-standard safety measures rather than the safer and more costly liner tieback design used by BP's.  The article stated, in part:

> The design was used on the well that exploded in the Gulf of Mexico on April 20, killing 11 workers and causing America's worst offshore oil spill. The only other major well design, which is more expensive, includes more safeguards against a natural-gas blowout of the kind that destroyed the *Deepwater Horizon*.
>
> A Journal analysis of records provided by the U.S. Minerals Management Service shows that BP used the less costly design— called "long string"—on 35% of its deepwater wells since July 2003, the earliest date the well-design data were available. Anadarko Petroleum Corp., a minority partner of BP's in the destroyed well, used it on 42% of its deepwater Gulf wells, though it says it doesn't do so in wells of the type drilled by BP.

Both companies used the design much more often, on average, than other major Gulf drillers. Out of 218 deepwater wells in the Gulf drilled since July 2003, 26% used the long-string design. It derives its name from its use of a single, long "string" of pipe from the sea floor to the bottom of the well.

Other big drillers use long-string design less frequently than BP, according to the Journal's data analysis.

…

A long-string design is cheaper because a single pipe runs the length of the well and can be installed in one step. But it also can create a dangerous pathway for natural gas to rise unchecked outside the pipe.

…

The other method, known as "liner tieback," is more complex and costlier. First, a section of pipe called a liner is placed at the bottom of the well and cemented into place, creating an extra barrier to prevent natural gas from rising to the surface. Typically, another pipe is connected to the liner to create a pipe to the surface.

…

A letter to BP's CEO, Mr. Hayward, by two Democratic Congressmen ahead of his testimony to their committee on Thursday, said the choice of the long-string design for the Horizon well was one of five decisions BP made that posed a trade-off between cost and well safety.

93. Moreover, BP failed to install at least two pieces of back-up safety equipment that would have stopped the leak even without the blowout preventer. First, BP elected not to install an acoustically activated remote-control shut-off valve, costing only $550,000. Such acoustic switches are mandated in countries like Brazil and Norway, and are employed by companies such as Royal Dutch Shell and Total SA, but have not been legally required in the U.S. due to the lobbying efforts of BP and other oil companies. Second, BP chose not to install a deep-water valve that would have been placed about 200 feet under the sea floor. BP ignored these

precautions despite being well aware of the increased risk of a failure of the primary blowout safety mechanism, the blowout preventer, from deep-sea operators.

94.     Over ten years ago, the U.S. Minerals Management Service ("MMS") sent out an industry-wide safety alert ordering companies drilling in deep water in the outer continental shelf to have effective backup systems. The March 2000 notice stated: "The MMS considers a backup [blowout preventer] actuation system to be an essential component of a deepwater drilling system, and therefore expects OCS operators to have reliable back-up systems for activating the [blowout preventer]."  MMS, however, left it up to the individual companies to decide what kind of backup system to use. BP chose the cheapest method, electing not have a backup system for activating the blowout preventer on the *Deepwater Horizon*.

95.     Earlier incidents also provided warnings of similar risk, such as an MMS study that noted that blowouts during cementing work were continuing with alarming regularity, particularly in the Gulf of Mexico.  Cementing was a factor in 18 of 39 well blowouts in the Gulf of Mexico between 1992 and 2006.

96.     BP's direction of the completion operations of the well, in particular the installation of the final cement casing at the wellhead prior to the conclusion of the exploratory phase of the well, was carried out by Halliburton and BP with extreme recklessness.  As The New York Times reported on May 3, 2010: "More than a half-dozen workers who were on the rig at the time of the explosion told the lawyers that the rig operator had seemed to be rushing to finish and detach from the well - a possible factor that could have contributed to the explosion."

97.     The explosion that sank the drilling rig came less than a day after workers finished pumping concrete into the well, a step toward closing it off temporarily.  BP planned to return to the well later to set up a permanent rig and start producing oil.

98.     Encasing a well in concrete is one of the most critical aspects of oil drilling, and presents many risks.  The concrete involved is highly specialized. It needs to be blended and stirred properly. It also must be pumped down into the well so that it comes out the bottom and oozes back up around the well casing, forming a tight seal.

99.     The concrete work apparently did not achieve a complete seal, and natural gas started seeping into the well in the late stages, the lawyers said.  However, idling a rig to address such a problem can cost huge sums. Lawyers said that supervisors either missed or ignored the signals and proceeded with the job.

100.     In addition, BP was aware of or should have known that an August 2009 blowout in the Timor Sea off the coast of Australia, which was found to have been caused by careless cementing work. During that incident, which bears a strong resemblance to the *Deepwater Horizon* disaster, oil leaked from the site for ten weeks, spreading damage over 200 miles from the well site.

101.     Employees working on the *Deepwater Horizon* experienced recurring problems with pockets of highly flammable natural gas forcing its way up the drilling pipes. Prior to the *Deepwater Horizon* incident, BP did not view these incidents as problematic, but instead stated that the gas was likely to only create a "negligible" risk. The government, however, cautioned BP that gas buildup was a genuine concern and that BP should take note and "exercise caution." In the weeks leading up to the *Deepwater Horizon* incident, so much natural gas rose to the surface that an emergency announcement called for a stop to all "hot work," meaning any welding, cooking or any other use of fire or igniters.  Smaller emissions of gas also slowed work at the rig on other occasions too.

102.     Despite the dangers posed by the extreme gas build up, BP allowed Halliburton to employ a risky technique of mixing nitrogen gas into the cement to create a mousse-like compound employees on the *Deepwater Horizon* have suggested that workers were motivated to finish early in order to earn bonuses for finishing the job ahead of schedule.

103.     The New York Times has also reported that: "At least one worker who was on the oil rig at the time of the explosion on April 20, and who handled company records for BP, said the rig had been drilling deeper than 22,000 feet, even though the company's federal permit allowed it to go only 18,000 to 20,000 feet deep."

104.     As the oil continues to make landfall along the Gulf Coast, it has caused and will continue to cause severe damages to the delicate wetlands and intertidal zones that line the coast of Louisiana, Mississippi, Alabama, and Florida, destroying the habitats where countless species of fish and marine life breed, spawn, and mature.

105.     In addition, the Gulf accounts for about one-fifth of the total U.S. commercial seafood production and nearly three-quarters of the nation's shrimp output.  Nearly a third of all marine recreational fishing trips, including the $1 billion-per-year sport fishing industry, take place on Gulf waters.  All of these activities and business are now in serious jeopardy.

106.     Aside from economic damage to the fishing, tourism, shipping and oil industries, among others, the clean-up is having deleterious health effects on clean-up workers.

107.     In the months following the *Deepwater Horizon* incident, BP has been unable to stop the gushing of thousands of gallons of oil into the Gulf Coast waters.  While BP finally was able to contain some of the oil spill beginning in June 2010, approximately six weeks after the disaster, complete containment will likely not occur until August 2010 and oil may reach the

shores far up the east coast of the United States.  At the time of this filing, BP has not stopped the flow of oil into the Gulf of Mexico.

108.    In mid-June, BP agreed to set aside a $20 billion escrow fund over the next few years to pay damage claims to thousands of fishermen and others living and working along the Gulf Coast. BP also said that it would sell oil and gas fields and cut investments in drilling if necessary to ensure BP has enough money to pay for any such costs.

109.    With the public losing faith in Hayward's efforts to respond to the continuing oil spill crisis, BP replaced Hayward with Robert Dudley, a BP managing director.

110.    On April 19, 2010, the day before the *Deepwater Horizon* disaster, BP ADSs closed at $59.88.  Since that time, as a result of the oil spill, the price of BP ADSs trended as low as $29, a decline of more than 50%, resulting in over $70 billion in losses to BP p.l.c.'s market capitalization, and hundreds of millions of dollars in losses to the ESP.

111.    With the price of BP ADSs in a steady decline since the first day of the *Deepwater Horizon* explosion, stock analysts are questioning whether BP and BP p.l.c. can survive as a going concern.  In commenting on whether Hayward would resign or BP p.l.c. would issue a dividend, one analyst stated "'[t]he situation is now beyond both of these points and the key question is can BP survive?'"  *See Benn Harrington, BP Survival Worries Drag FTSE 100 Down*,  telegraph.co.uk, June 1, 2010.

112.    Hayward, in an email to employees on May 19, 2010, recognized that employees were concerned about the impact of the *Deepwater Horizon* disaster on their pensions.  Rather than tell them the true impact, Defendant Hayward misleadingly assured employees that BP p.l.c. had enough financial strength to respond to the disaster.  Hayward stated, in part:

> Let me first of all reiterate that since we started on the Forward
> Agenda in 2007 - safe, reliable and efficient operations have been

the number one priority on our corporate agenda. I believe that within BP there can be no doubt that this is the case, and I am absolutely determined that it will remain that way. Since 2007, our recordable injury frequency has reduced by 29%, and the number of high potential incidents has decreased by 35% - with a reduction of close to 40% for process safety related high potential incidents. I am proud of this improvement. And our current challenges completely reinforce my determination to improve further.

…

I have said all along that we will be judged by how we respond, and that remains the case. The strength of the BP balance sheet allows us to take on this responsibility. I know that many of you have questions about how this incident will impact BP, your jobs, pensions, and our future plans. We have demonstrated robust cash flow generation over the past few quarters and at the end of 1Q our gearing ratio was below our 20 to 30% target range, at 19% or some $25 billion. We can therefore afford to do the right thing, and we will do just that - our financial strength will also allow us to come through the other side of this crisis, both financially secure and stronger as a result of what we have learned from this tragic incident and how we have responded.

113.    However, Hayward did not tell employees that several possible scenarios could mean the end for BP.  For example, if the government chose to prosecute BP under the Clean Water Act, it could be fined $4,300 for each barrel leaked into the Gulf, making BP liable for over $100 billion which could bankrupt BP.  Moreover, some reports have noted that as a result of criminal fines, BP could lose billions in government contracts, i.e. military contracts for aviation fuel and other products.

114.    In addition, Hayward has publicly stated that "BP is a 'responsible party' under the Oil Pollution Act. This means that federal law requires BP, as one of the working interest owners of Mississippi Canyon 252, to pay to clean up the spill and to compensate for the economic and environmental impacts of the spill. Let me be clear: BP has accepted this responsibility and will fulfill this obligation." *See Prepared Testimony of Tony Hayward to*

*United States House of Representatives, Committee on Energy and Commerce, Subcommittee on Oversight and Investigations, June 17, 2010.*

115.    Some analysts estimated the legal costs in connection with the spill to exceed $60 billion alone and others estimate that clean up costs to be between $15 and $40 billion.  However a jury verdict against BP and/or BP p.l.c. could take the cost of the spill into hundreds of billions of dollars.  Analysts on Wall Street refer to this as the "Texaco Scenario," referring to the 1987 verdict against Texaco which forced it to file Chapter 11 because it could not afford to pay a jury award.  *See* Andrew Ross Sorkin, *Imagining the Worst for BP's Future*, N.Y. Times, June 7, 2010, at B1.

## MISMANAGEMENT OF THE ESP'S ASSETS

116.    Pursuant to ERISA § 404(a), 29 U.S.C. § 1104(a), at all times relevant to this Complaint, Defendants had a duty to discharge their duties with respect to the ESP with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like aims, and to diversify investments in the ESP so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

117.    Defendants are not entitled to the protections of ERISA § 404(c), 29 U.S.C. § 1104(c), because (i) Participants did not exercise independent control over their accounts, (ii) Defendants subjected Participants to improper influence with respect to the ESP's investments in the BP Stock Fund, and (iii) Defendants concealed material non-public information concerning the adequacy of BP's safety protocols that Defendants were not precluded from disclosing under applicable law.

118.    Defendant SSB&T is not entitled to the protections of Department of Labor regulation § 2550.404a-1(b)(3)(ii) because it knew or should have known that the information, if

any, provided by it's co-fiduciaries at BP concerning the safety protocols in place for BP's gas and oil operations was incorrect.

119.     During the Class Period, BP ADSs were an imprudent Plan investment because, *inter alia,* BP lacked adequate safety protocols in its offshore drilling operations which could result in hundreds of billions of dollars in liability for BP and BP p.l.c.

120.     Defendants breached their fiduciary duties when they failed to conduct an appropriate investigation into whether BP ADSs were a prudent investment for the ESP; failed to liquidate the ESP of BP ADSs; failed to discontinue further contributions of BP ADSs to the ESP; failed to remove or take other similar action BP ADSs as an investment option for the ESP; failed to either properly consult or appoint independent fiduciaries regarding the appropriateness of an investment in BP ADSs; and failed to resign as fiduciaries of the ESP if as a result of their employment by BP, they could not loyally serve the ESP and the Participants.   In fact, Defendants continued to invest and to allow investment of the ESP's assets in BP ADSs even though they knew or should have known that BP had inadequate safety protocols in place for its gas and oil operations, resulting in a decrease in the value of BP ADSs.

121.     Further, Defendants breached their fiduciary duties by direct and indirect communications with the Participants, made in their fiduciary capacity, which contained statements concerning BP ADSs that these Defendants knew or should have known were untrue and inaccurate.   These communications included Class-wide and Plan-wide affirmative and materially misleading statements as to BP's inadequate safety protocols in place for its gas and oil operations as discussed in this Complaint, that were contained in the following documents that, upon information and belief, were incorporated into plan documents disseminated to the Participants:  BP p.l.c.'s Annual Report on Form 20-F for the most recently ended fiscal year, BP

p.l.c.'s reports on Form 6-K, and any filings made with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, and the ESP's Annual Report on Form 11-K.

122.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

123.    Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the ESP's assets should not have been invested in BP ADSs during the Class Period.

124.    As a consequence of the Defendants' failures to act prudently, the Defendants caused significant losses to the ESP.

125.    The Plan suffered hundreds of millions of dollars in principal losses because Defendants imprudently invested the ESP's assets in the BP Stock Fund during the Class Period in breach of Defendants' fiduciary duties.

126.    Defendants are liable for the ESP's losses because the ESP's investment in BP ADSs were a result of Defendants' decision to imprudently maintain the assets of the ESP in BP ADSs.  Thus, Defendants are liable for these losses because they failed to take the necessary, appropriate and required steps to ensure effective and informed independent participant control over the investment and decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.

127.    Defendants withheld material, non-public facts from Participants and provided inaccurate and incomplete information to them regarding the Company's safety protocols in its

drilling operations and the soundness of BP ADSs as an investment vehicle.  As a consequence, Participants did not exercise independent control over their investments in BP ADSs, and Defendants remain liable under ERISA for losses caused by such investment.

128.    Had Defendants properly discharged their fiduciary and co-fiduciary duties, including monitoring and removal of fiduciaries who failed to satisfy ERISA-mandated duties of prudence and loyalty, and eliminating BP ADSs as an investment alternative when it became imprudent, the ESP would have avoided some or all of the losses that they, and indirectly the Participants, suffered by continuing to invest in BP ADSs.

129.    Plaintiff, on behalf of the ESP, seeks alternative types of relief under ERISA.

130.    First, with respect to calculation of the losses to the ESP, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the ESP would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in BP ADSs would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the ESP's lost value and puts the Participants in the position they would have been in if the ESP had been properly administered.  Accordingly, Plaintiff, on behalf of the ESP, seeks lost profits as a result of Defendants' breaches.  In particular, Plaintiff, on behalf of the ESP, seeks the profit that had been lost by investing in BP ADSs instead of investing in other prudent funds within the ESP that were available at the time and which have outperformed the returns on the BP Stock Fund.

131.    Second, Plaintiff, on behalf of the ESP, seeks to recover the losses incurred by investing her retirement funds in BP ADSs when BP ADSs were a risky and imprudent investment.

132.   Third, Plaintiff, on behalf of the ESP, seeks a constructive trust -- both individually and on behalf of the ESP -- over all amounts by which the ESP's fiduciaries benefited as a result of their breaches.  In particular, Plaintiff seeks to impose a constructive trust on the amounts received by Defendants for selling their BP shares, including amounts that certain Defendants received when they sold BP shares at the same time that those Defendants were causing the ESP to use Plan assets to acquire and hold BP ADSs.

133.   Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (i) a monetary payment to the ESP to make good to the ESP the losses to the ESP resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2) and (3), 29 U.S.C. §§ 1109(a) and 1132(a)(2); (iii) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (iv) taxable costs and interests on these amounts, as provided by law; and (v) such other legal or equitable relief as may be just and proper.

134.   Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the ESP in this case.

## CAUSES OF ACTION

## COUNT I

**Failure to Prudently and Loyally
Manage the ESP and the ESP's Assets
(Breaches of Fiduciary Duties in Violation of ERISA § 404 Against All Defendants)**

135.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

136.    At all relevant times, Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

137.    As alleged above, Defendants were all responsible, in different ways and to differing extents, over management of the ESP or disposition of the assets of the ESP and were, during the Class Period, responsible for ensuring that the ESP's investment options, including the BP Stock Fund, made available to the Participants, were prudent and are liable for losses incurred as a result of the imprudence of such investments.

138.    Additionally, pursuant to ERISA, fiduciaries are required to disregard plan documents or directives they know or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, fiduciaries may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

139.    Defendants were obligated to discharge their duties with respect to the ESP with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

140.    According to ERISA § 404, a fiduciary's investment or investment course of action is prudent if: a) he or she has given appropriate consideration to those facts and

circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the ESP's investment portfolio with respect to which the fiduciary has investment duties; and b) he or she has acted accordingly.  "Appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

    – The composition of the portfolio with regard to diversification;

    – The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

    – The projected return of the portfolio relative to the funding objectives of the plan.

141.    Given the mismanagement of BP as discussed herein, Defendants did not act prudently when they continued to invest the ESP's assets in BP ADSs because, among other reasons, BP lacked adequate safety protocols in its offshore drilling operations which could result in hundreds of billions of dollars in liability.

142.    The participation in and knowledge of BP's dire situation as alleged herein is imputed and attributed to each Defendant.

143.    Defendants breached their duties to prudently and loyally manage the ESP's assets.  During the Class Period, Defendants knew or should have known that BP ADSs were not a suitable and appropriate investment for the ESP as described herein.  Nonetheless, during the Class Period, Defendants continued to invest the ESP's assets in BP ADSs instead of other, more suitable, investments.  Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take adequate steps to prevent the ESP, and indirectly Plan Participants and beneficiaries, from suffering losses as a result of the ESP's investment in BP ADSs.

144.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the ESP, and indirectly Plaintiff and the Participants and beneficiaries, lost a significant portion of their retirement investment.

145.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Defendants named in this count, are liable to restore the losses to the ESP caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT II

### Failure to Provide Complete and Accurate Information
### (Breaches of Fiduciary Duties in Violation of
### ERISA Section 404 of ERISA 29 U.S.C. § 1104)

146.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

147.    At all relevant times, the scope of the fiduciary responsibility of all Defendants included Plan-related communications and material disclosures.

148.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information

participants need to exercise their rights and interests.  This duty to inform participants includes an obligation to provide plan participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding investment options such that participants can make informed decisions with regard to the prudence of investing in such options as are made available.  This duty applies to all plan investment options, including investment in the stock of the participant's employer.

149.    During the Class Period, upon information and belief, Defendants made direct and indirect communications with the Participants, including statements regarding investments in the BP Stock Fund.  These communications included, but were not limited to, SEC filings, annual reports, press releases and Plan documents (including SPDs and/or prospectuses regarding the Plan's holdings of BP ADSs), which included and/or reiterated these statements.  During the Class Period, BP p.l.c.'s SEC filings were incorporated into and part of the SPDs and/or the registration statements.

150.    Further, Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Participants, well-recognized in the 401(k) literature and the trade press, concerning investment in company stock, including that:

- out of loyalty, employees tend to invest in company stock;

- employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

- employees tend not to change their investment option allocations in the plan once made;

- no qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

- lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

- even for risk-tolerant investors, the risks inherent to company stock are not commensurate with its rewards.

151.    While Defendants knew or should have known these facts and knew of the high concentration of the Plan's funds in BP ADSs, they still disseminated inaccurate, incomplete and materially misleading statements Plan-wide regarding BP's safety protocols in place for its oil and gas operations and/or did nothing to correct such statements.

152.    Defendants knew or should have known that investment in BP ADSs carried with it an inherently high degree of risk.  This inherent risk made the Defendants' duty to provide complete and accurate information particularly important.

153.    Defendants breached their duty to inform Participants by failing to provide complete and accurate information regarding BP's potential exposure to liability on account of its inadequate safety protocols, and the consequent risk and inflation of the value of BP ADSs and, generally, by conveying inaccurate information regarding BP's operations.  These failures were particularly devastating to the Plan and the Participants – losses in this investment had an enormous impact on the value of Participants' retirement assets.

154.    These actions and failures to act were uniform and caused the Plan, and/or the Participants and beneficiaries of the Plan, to continue to make and maintain substantial investments in BP ADSs in the Plan at a time when Defendants knew or should have known that the Participants and beneficiaries lacked complete and accurate information concerning their investment in the BP Stock Fund.  Plaintiff and the Class relied to their detriment on these Defendants' incomplete, inaccurate and materially misleading statements regarding the performance and future health of BP ADSs.

155.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable participant of a plan resulting in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his detriment.  Here, the above-described statements, acts and omissions of the Defendants constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in BP ADSs and were material to any reasonable person's decision about whether or not to invest or maintain any part of his or her invested assets of the ESP in BP ADSs during the Class Period.  Plaintiff and other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts and omissions of the Defendants as described herein.

156.    As a consequence of Defendants' breaches of fiduciary duty, the ESP suffered hundreds of millions of dollars in losses.  If Defendants had discharged their fiduciary duties to manage prudently and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the ESP, and indirectly Plaintiff and the Participants and beneficiaries, lost a significant portion of their retirement investments.

157.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

**Failure to Monitor Fiduciaries
(Breaches of Fiduciary Duties in Violation of ERISA § 404
by BP and BP p.l.c.)**

158.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

159.   This Count alleges fiduciary breaches against Defendants BP and BP p.l.c.

160.   As alleged above, during the Class Period, BP and BP p.l.c. were named fiduciaries of the ESP pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciary of the ESP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

161.   As alleged above, the scope of the fiduciary responsibilities of BP and BP p.l.c. included the responsibility to appoint, and remove, and thus, monitor the performance of other fiduciaries of the ESP, including the members of the Savings Plan Committee and the Investment Manager.

162.   Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

163.   The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the ESP's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

164.   Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know

that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

165.    Here, BP and BP p.l.c. breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about BP's business problems alleged above, which made BP ADSs an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries appreciated the huge and unjustified risk of significant investment loss by rank and file employees in their respective plan accounts.

166.    In addition, BP and BP p.l.c., in connection with their monitoring and oversight duties, were required to disclose to those they monitored accurate information about the financial condition and practices of BP that they indisputably knew or should have known, that the monitored Plan fiduciaries needed to make sufficiently informed fiduciary investment decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, BP and BP p.l.c.  breached their fiduciary duties under the ESP and ERISA.

167.    BP and BP p.l.c. are liable as co-fiduciaries because they knowingly participated in the fiduciary breaches by the monitored Defendants, it enabled the breaches by these Defendants and it had knowledge of these breaches, yet did not make any effort to remedy the breaches.

168.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the ESP, and indirectly Plaintiff and the other Participants and beneficiaries, lost a significant portion of their retirement investment.

169.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), BP and BP p.l.c. are liable to restore the losses to the ESP caused by their

breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT IV

**Breach of Duty to Avoid Conflicts of Interest**
**(Breaches of Fiduciary Duties in Violation of ERISA § 404**
**Against Hayward, McKay, Atkins, Williamson, Dorazil and Shaw)**

170.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

171.   Hayward, McKay, Atkins, Williamson, Dorazil and Shaw are collectively referenced in this Count as the "Individual Defendants."  At all relevant times, as alleged above, the Individual Defendants were fiduciaries of the ESP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

172.   ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

173.   The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

174.   Upon information and belief, because the compensation of many of the Individual Defendants was significantly tied to the price of BP ADSs, Defendants had an incentive to keep the ESP's assets heavily invested in BP ADSs on a regular, ongoing basis.  Elimination of BP ADSs as an investment option would have reduced the overall market demand for BP shares and

sent a negative signal to Wall Street analysts, which would have adversely affected the price of BP shares, resulting in lower compensation for the Individual Defendants.

175.    Some Defendants may have had no choice in tying their compensation to BP shares (because compensation decisions were out of their hands), but Individual Defendants did have the choice in what information to disclose to the Participants and whether to keep the Participants' retirement savings invested in BP ADSs.

176.    These conflicts of interest put the Individual Defendants in the position of having to choose between their own interests and the interests of the Participants.

177.    Defendants placed their own interests in investing the ESP's assets in BP ADSs over the Participants' interest in maintaining a prudently invested ERISA plan.

178.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Individual Defendants are liable to restore the losses to the ESP caused by their breaches of fiduciary duties alleged in this Count.

## COUNT V

### Co-Fiduciary Liability
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by all Defendants)

179.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

180.    This Count alleges co-fiduciary liability against all Defendants.

181.    As alleged above, during the Class Period the Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

182.   As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability that he or she may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Defendants breached all three provisions.

183.   ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if that fiduciary has knowledge of a breach by such other fiduciary, unless it makes reasonable efforts under the circumstances to remedy the breach.  Here, the Defendants knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

184.   BP and BP p.l.c., through their directors and employees, engaged in inappropriate business practices, withheld material information from the market, provided the market with misleading disclosures, and profited from such practices, and, thus, knowledge of such practices is imputed to BP and BP p.l.c. as a matter of law.

185.   Hayward and the Savings Plan Committee Defendants, by virtue of their positions at BP, participated in and/or knew about the BP and BP p.l.c.'s inappropriate safety practices, and their consequences, including the resulting imprudence of BP ADSs as an investment for the ESP's assets.  Hayward and the Savings Plan Committee Defendants knew that SSBT was breaching its duties by continuing to invest the ESP's assets in BP ADSs when it was no longer prudent to do so, and providing incomplete and inaccurate information to Participants. Yet, Hayward and the Savings Plan Committee Defendants failed to undertake any effort to remedy these breaches.  Instead, they compounded them by obfuscating the risk that BP and BP p.l.c.'s improper safety activities posed to BP, and, thus, to the ESP.

186.    SSBT knew or should have known that the information it was provided by BP regarding BP and BP p.l.c. and their safety practices, if any, was incorrect.  Accordingly, SSBT knew that the Savings Plan Committee Defendants were breaching their duties by continuing to invest the ESP's assets in BP ADSs when it was no longer prudent to do so, and providing incomplete and inaccurate information to Participants. Yet, SSBT failed to undertake appropriate efforts to remedy these breaches.  Instead, it compounded them by obfuscating the risk that the BP and BP p.l.c.'s improper safety activities posed to BP, and, thus, to the ESP.

187.    ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach.  Upon information and belief, BP participated in the fiduciary breaches of the Administrator Defendants.  BP also, as a de facto fiduciary, participated in all aspects of the fiduciary breaches of the other Defendants.  Likewise, the Board Defendants participated in the breaches of the Administrator Defendants because, as alleged above, they knew or should have known of the Company's improper conduct and yet, ignoring their oversight responsibilities, permitted the Administrator Defendants to breach their duties.

188.    ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities that give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

189.    The failure of Defendants to monitor co-fiduciaries enabled them to breach their duties.

190.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the ESP, and indirectly Plaintiff and the other Participants, lost a significant portion of their retirement savings.

191.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Defendants are liable to restore the losses to the ESP caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.    A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An Order compelling the Defendants to make good to the ESP all losses to the ESP resulting from Defendants' breaches of their fiduciary duties, including losses to the ESP resulting from imprudent investment of the ESP's  assets, and to restore to the ESP all profits the Defendants made through use of the ESP's assets, and to restore to the ESP all profits that the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the ESP as the result of breaches of fiduciary duty;

E.    An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.    Actual damages in the amount of any losses the ESP suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

G.      An Order that Defendants allocate the ESP's recoveries to the accounts of all

Participants who had their accounts invested in the common stock of BP maintained by the ESP

in proportion to the accounts' losses attributable to the precipitous decline in the share price of

BP p.l.c.;

H.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the

common fund doctrine; and

J.      An Order for equitable restitution and other appropriate equitable and injunctive

relief against the Defendants, including appropriate modifications to the ESP to ensure against

further violations of ERISA.

Dated:  June 28, 2010                    Respectfully submitted


                                        */s/  Marvin A. Miller*
                                        Marvin A. Miller
                                        Matthew E. Van Tine
                                        **MILLER LAW LLC**
                                        115 S. LaSalle Street
                                        Suite 2910
                                        Chicago, IL  60603
                                        Tel:  (312) 332-2400

                                        Sanford P. Dumain
                                        Lori G. Feldman
                                        Arvind Khurana
                                        **MILBERG LLP**
                                        One Pennsylvania Plaza
                                        New York, NY  10119
                                        Tel:  (212) 594-5300

                                        Robert I. Harwood
                                        Jeffrey Norton
                                        **HARWOOD FEFFER LLP**
                                        488 Madison Avenue
                                        New York, NY 10022-5725
                                        Tel:  (212) 935-7400

W. Mark Lanier
Evan M. Janush
**THE LANIER LAW FIRM**
6810 FM 1960 West
Houston, TX  77069
Tel: (713) 659-5200

*Counsel for Plaintiff*

# EXHIBIT B

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| THOMAS P. SOESMAN, Individually And On Behalf Of All Others Similarly Situated, | Civil Action: |
| Plaintiff, | |
| vs. | |
| BP P.L.C., BP CORPORATION NORTH AMERICA INC., RICHARD J. DORAZIL, LAMAR MCKAY, GREGORY T. WILLIAMSON, STEPHANIE ATKINS, NEIL SHAW, THOMAS L. TAYLOR, BYRON GROTE, THE INVESTMENT COMMITTEE, THE SAVINGS PLAN INVESTMENT OVERSIGHT COMMITTEE, STATE STREET BANK AND TRUST COMPANY, and JOHN DOES 1-20, | |
| Defendants. | |

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
## EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiff, a participant in the BP Employee Savings Plan ("ESP")[1], covering substantially all employees of BP p.l.c. and/or BP Corporation North America Inc. and their affiliated companies (collectively, "BP" or the "Company"), individually and on behalf of all others similarly situated (the "Participants"), alleges as follows:

## INTRUCTION

1.     Plaintiff brings this action on behalf of the Plan and all participants and beneficiaries in the Plan (the "Participants") to recover losses to the Plan for which the fiduciaries of the Plan are liable pursuant to Sections 409 and 502(a)(2) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109 and 1132(a)(2).  In addition, under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from

---

[1]     Plaintiff also brings this action on behalf of the BP Capital Accumulation Plan ("CAP"), the BP Partnership Savings Plan ("PSP") and the BP DirectSave Plan ("DSP").  The ESP, CAP, PSP, and DSP plans are collectively referred to herein as the "Plans" or "Plan".

Defendants, including, without limitation, injunctive relief and, as available under applicable law, a constructive trust, restitution, equitable tracing, and other monetary relief.

2.     From October 30, 2009 through the present (the "Class Period"), the Plan acquired and held shares of BP American Depositary Shares ("ADSs") ("BP ADSs" or "Company ADSs"), which was offered as one of the retirement saving options in the Participant Contribution Component of the Plan.

3.     Defendants, each having certain responsibilities regarding the management and investment of Plan's assets, breached their fiduciary duties to the Plan and Participants by failing to prudently and loyally manage the Plan's investment in Company ADSs by, among other things, (i) continuing to offer Company ADSs as a retirement saving option; (ii) continuing to acquire and hold shares of Company ADSs in the Plan when it was imprudent to do so; (iii) failing to provide complete and accurate information to Participants regarding the Company's financial condition and the prudence of investing in Company ADSs; and (iv) maintaining the Plan's pre-existing investment in Company ADSs when it was no longer a prudent investment for the Plan.

4.     As a result of Defendants' fiduciary breaches, as alleged herein, the Plan has suffered substantial losses, resulting in the depletion of millions of dollars of the retirement savings and anticipated retirement income of the Plan's Participants.  Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from their fiduciary breaches.

5.     Because Plaintiff's claims apply to the Participants as a whole, and because ERISA authorizes Participants such as Plaintiff to sue for plan-wide relief for breach of fiduciary duty, Plaintiff brings this as a class action on behalf of all Participants of the Plan during the

Class Period. Plaintiff also brings this action as a Participant seeking plan-wide relief for breach of fiduciary duty on behalf of the Plan.

6. In addition, because the information and documents on which Plaintiff's claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiff's allegations are by necessity upon information and belief. At such time as Plaintiff has had the opportunity to conduct additional discovery, Plaintiff will, to the extent necessary and appropriate, amend the Complaint or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the following Counts below.

## JURISDICTION AND VENUE

7. ***Subject Matter Jurisdiction.*** This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a). This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(l), 29 U.S.C. § 1132(e)(l). In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

8. ***Personal Jurisdiction***. ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of Defendants are residents of the United States, and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(l)(A), because they all would be subject to the jurisdiction of a court of general jurisdiction in this District.

9. ***Venue***. Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary

breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary place of business in this district.

## PARTIES

### Plaintiff

10.     **Plaintiff Thomas P. Soesman** is a former BP employee and is a participant in the Plan.

### Defendants

11.     **Defendant BP p.l.c.** is a public limited company incorporated in England and Wales. BP p.l.c.'s principal executive offices are located at 1 St. James's Square, London SW1Y 4PD, England.

12.     **Defendant BP Corporation North America Inc.** is an Indiana corporation with its principal executive offices at MC 2 East, 4101 Winfield Road, Warrenville, IL 60555.   BP Corporation North America Inc. is the company formerly named BP Amoco Corporation and, before that, named Amoco Corporation, which was acquired by BP p.l.c. or its predecessor in or about 1998.  On information and belief, BP Corporation North America Inc. is a wholly owned subsidiary or other fully controlled entity of BP p.l.c. BP Corporation North America Inc. is the Sponsor of the Plan.

13.     **Defendant Richard J. Dorazil** ("Dorazin") is the Vice President Total Rewards, Western Hemisphere for BP p.l.c. and/or BP Corporation North America Inc.  By virtue of his position with the Company, he is the Named Plan Administrator.  On information and belief, Dorazil is also a member of the Oversight Committee and/or the Investment Committee. Defendant Dorazil also signed the BP Employee Savings Plan (Amended and Restated as of January 1, 2008 ("Plan Document").

14.     ***Defendant Lamar McKay*** ("McKay") is the Chief Representative of BP in the United States.  On information and belief, Defendant McKay is a member of the Investment Committee.

15.     ***Defendant Gregory T. Williamson*** ("Williamson") is the Director of Trust Investments for BP in the United States.  On information and belief, Defendant Williamson is the Secretary of the Investment Committee.

16.     **Defendant Stephanie Atkins** ("Atkins") is the BP Vice President Human Resources WY Operations and SAP Development.  On information and belief, Defendant Atkins is a member of the Investment Committee.

17.     ***Defendant Neil Shaw*** ("Shaw") is a BP Strategic Performance Unit Leader, in charge of BP's Gulf of Mexico division.   On information and belief, Defendant Shaw is a member of the Investment Committee.

18.     ***Defendant Thomas L. Taylor*** ("Taylor") is, on information and belief, a member of the Investment Committee.

19.     ***Defendant the Investment Committee*** ("Investment Committee") is the entity named in Plan documents with fiduciary responsibility over the selection and removal of Plan investment options.  Pursuant to the Plan Document, the Investment Committee "means the Investment Committee, the members of which are designated by the Appointing Officer for the Trust; provided, however, that with respect to any plan which is defined contribution plan with participant investments, the Investment Committee means the Savings Plan Investment Oversight Committee.  In the event that there is no functioning Investment Committee, the Appointing Officer will serve as the Investment Committee."  Plan Document, Article I, § 1.61 at pp. 12-13.

20.     **Defendant the Savings Plan Investment Oversight Committee** ("Oversight Committee") is an entity with fiduciary responsibility over Plan investment options.   The Investment Committee and the Oversight Committee are hereinafter referred to as the "Investment Committee".

21.     **Defendant State Street Bank and Trust Company** ("State Street") is a Massachusetts trust company with offices at One International Place, Boston, MA 02110.   State Street is the Trustee of the Plan.

22.     **Defendants John Does 1-20 ("John Does 1-20")** are residents of the United States and are or were fiduciaries of the Plan during the Class Period.   These defendants whose identities are currently unknown to Plaintiff, may include additional BP employees.   Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the following class of persons similarly situated (the "Class"):

> All persons who were Participants in or beneficiaries of the Plan at any time between October 30, 2009 and the present, inclusive (the "Class Period) and whose accounts held Company ADSs or units in the BP ADSs, but excluding all named defendants and their heirs or successors in interest.

24.     The members of the Class are so numerous that joinder of all members is impracticable.   While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery.

25.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.   Among the questions of law and fact common to the Class are:

(a) whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

(b) whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's Participants and beneficiaries; and

(c) whether Defendants violated ERISA.

26. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained a diminution of vested benefits arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

27. Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, ERISA, and complex civil and commercial litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

28. Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members or the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical manner, be dispositive of the interests of the other members of the Class parties to the actions, or substantially impair or impede their ability to protect their interests.

29. Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecuting separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole;

and (iii) questions of law or fact common to members of the Class predominate over any

questions affecting only individual members and a class action is superior to the other available

methods for the fair and efficient adjudication of this controversy.

30.     In the alternative, Plaintiff requests that the Court allow them to proceed under

ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2).   Section 502(a)(2), 29 U.S.C. § 1132(a)(2)

states that "[a] civil action may be brought —" "by the Secretary [of Labor], or by a participant,

beneficiary or fiduciary for appropriate relief under section 1109 of this title[.]"   ERISA Section

409(a), 29 U.S.C. § 1109(a), sets forth that:

> Any person who is a fiduciary with respect to a plan who breaches
> any of the responsibilities, obligations, or duties imposed upon
> fiduciaries by this subchapter shall be personally liable ***to make
> good to such plan any losses to the plan resulting from each such
> breach, and to restore to such plan any profits of such fiduciary
> which have been made through use of assets of the plan by the
> fiduciary***, and shall be subject to such other equitable or remedial
> relief as the court may deem appropriate, including removal of
> such fiduciary.

(Emphasis added).

### THE PLAN

31.     The Plan is "employee pension benefit plan" as defined by §§ 3(3) and (3)(2)(A)

of ERISA, 29 U.S.C. §§ 1002(3) and 1002(2)(A).

32.     The Plan is legal entities that can sue or be sued.   ERISA § 502(d)(1), 29 U.S.C. §

1132(d)(1).

33.     In this action for breach of fiduciary duty, the Plan is neither a plaintiff nor a

defendant.   Rather, Plaintiff requests relief for the benefit of the Plan and for the benefit of its

Participants.

34.     The Plan is "defined contribution plan" or "individual account" Plan within the

meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual

accounts for each participant and for benefits based solely upon the amount contributed to the Participants' account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participants' accounts. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

35.     The Plan is a voluntary contribution Plan whereby Participants make contributions to the Plan ("Voluntary Contributions") and direct the Plan to purchase investments with those contributions from options pre-selected by Defendants which are then allocated to Participants' individual accounts.

36.     Pursuant to the Plan Document:

Plan Governance

(a)     <u>Authority</u>.  BP Corporation North America Inc., through the authority vested in the Board of Directors, has amended the plan, thereby:

(1)     enabling the Appointing Officer to have the Authority or Discretion to act, to extent provided in the Plan or trust, on behalf of the Plan or Trust, but not on behalf of the Company; and

(2)     establishing the Administrator and enabling the Administrator to have Authority or Discretion to act, to the extent provided in the Plan or trust, on behalf of the Plan or Trust, but not on behalf of the Company.

Plan Document, Article XIV, § 14.1 at p. 61.

37.     "The BP Employee Savings Plan is a 401(k) plan that lets you save a percentage of your eligible pay, up to the legal limits, toward your retirement."  BP employee savings plan (ESP).

38.     The ESP is part of a plan prospectus.  According to the ESP, the complete prospectus includes:

•     This summary of the BP Employee Savings Plan.

- The most recent Investment Options Guide brochure, including Updates.
- The Most recent Quarterly Investment Performance Statement.
- BP's most recent Annual Review.
- All documents incorporated by reference and future supplements to the above documents.
- Future supplements and amendments to this summary.

ESP at 1.

39.     The BP Employee Savings Plan "allows you to choose from more than 200 investment options.  You decide which options best suit your long-term investment needs and then set your investment direction.  Your investment direction applies to both your contributions and company matching contributions."  ESP at 29.

40.     The BP Employee Savings Plan sponsor is BP Corporation North America Inc. ESP at 51.  BP Corporation North America Inc.  has the following duties:

- Establishing rules and regulations regarding the plan.
- Determining eligibility of participants.
- Handling contributions, enrollments and calculations,
- Deciding, in his/her discretion, whether benefits should be paid.
- Selecting and contracting with a claims administrator.
- Determining expenses that can be paid from plan assets.
- Interpreting the plan.
- Operating and administering the plan.

ESP at 53.

41.     The BP Employee Savings Plan administrator is Vice President Total Rewards, Western Hemisphere BP Corporation North America, Inc.  ESP at 51.

42.     The BP Employee Savings Plan Trustee is State Street Bank and Trust Company. *Id.*  As Trustee State Street Bank and Trust Company is responsible for duties specifically assigned to it by the trust agreement, including:

- Having custody of the trust assets.

10

- Making – at the direction of the appropriate investment manager – all purchases, sales and redemptions of securities held by it.

- Voting – at the direction of the appropriate investment manager – stock held by the plan. However, the fund equivalent amount of BP ADSs associated with your investment in the BP Stock Fund is voted according to the instructions you provide (if these instructions are provided according to the guidelines established by the plan and ERISA)

43. The BP Employee Savings Plan Form S-8, dated Feb. 2, 2006, incorporated certain documents by reference:

The reports listed below have been filed with or furnished to the Securities and Exchange Commission ("Commission") by BP p.l.c., ("BP" or the "Company") and are incorporated herein by reference to the extent not superseded by documents or reports subsequently filed or furnished.

- BP's Annual Report on Form 20-F (SEC file number 001-6262) for the year ended December 31, 2004.

- BP's Reports on Form 6-K (SEC file number 001-6262) for the periods ended March 31, 2005 (filed on September 7, 2005), June 30, 2005 (filed on September 7, 2005) and September 30, 2005 (filed on October 25, 2005), in each case which contain financial statements of BP.

- BP Report on Form 6-K containing US GAAP Condensed financial information on September 7, 2005.

- BP's Report on Form 6-K (SEC file number 001-6262) dated August 6, 2001, which contains a description of the Ordinary Shares of BP.

In addition, all Forms 20-F filed by BP pursuant to the Securities Exchange Act of 1934, as amended, certain Reports on Form 6-K furnished by BP (which indicate on their cover pages that they are incorporated herein by reference), and all filings on Form 11-K of the BP Employee Savings Plan filed by BP after the date of this Registration Statement and prior to the filing of a post-effective amendment to this Registration Statement which indicate that all securities have been sold or which deregisters all securities then remaining unsold, shall be deemed to be incorporated by reference in this Registration Statement and to be a part hereof from the date of filing or furnishing of such documents or reports, to the extent not superseded by documents or reports subsequently filed or made.

44. Pursuant to the BP Amoco Master Trust for Employee Savings plans (As Amended and Restated as of April 6, 2000) (the "Trust Agreement"), "[t]he Investment

Committee and Chief Financial Officer have the authority and discretion to manage and control the Trust assets as provided to each in the Trust." Trust Agreement at 16, § 16.2 at 34.

A. **The Plan Fiduciaries**

45. ***Named Fiduciaries***. ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A). The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

46. ***De Facto Fiduciaries***. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

47. Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and its Participants under ERISA in the manner and to the extent set forth in the governing the Plan documents, through their conduct, and under ERISA.

48. As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plan and the Plan's investments solely in the interest of the Plan's Participants and beneficiaries and with the care, skill, prudence, and diligence under

12

the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

49.     Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

## FACTUAL BASIS OF THE FIDUCIARY BREACHES

### Defendants' Continued Disregard of Risks

50.     In 2007, Anthony Hayward took office.  Mr. Hayward promised to change the Company's culture, with a renewed commitment to safety.  However, the record shows that this promise to have been an empty one, as Hayward and Defendants have led the Company on a furious expansion of its underwater drilling operations across the globe, coupled with severe cost-cutting measures heedless of safety and environmental concerns.

### Deepwater Horizon

51.     On April 20, 2010, at approximately 9:45 p.m. CST, a mass of oil or natural gas erupted from the wellhead at the Macondo prospect site in the Gulf of Mexico off the shores of Louisiana, engulfing the Deepwater Horizon oil rig managed by BP in fire and sinking the rig 36 hours later.   The explosion and fire killed 11 workers, injured 17 others, and led to an uncontrolled oil leak in the Gulf, covering at least 3,850 square miles of fragile ocean and wetlands marine life. The disaster threatens to become the worst oil spill in history — far worse than the famous 1989 Exxon Valdez disaster — endangering the coasts of Louisiana, Mississippi, Alabama, and Florida for generations to come and wiping out the habitat of

hundreds of species of marine and oceanic life.  More than 400 species, including whales and dolphins, face a dire threat from the spill, along with Louisiana's barrier islands and marshlands.

52.     Prior to its destruction, the rig was an ultra-deepwater dynamic-positioned, semi-submersible oil rig.  It was owned and operated by Transocean and leased to BP through September 2013.  BP leased the rig to drill an exploratory well at the Macondo prospect site in Mississippi Canyon Block 252, located on the outer continental shelf off the coast of Louisiana. The rig was positioned about 50 miles southeast of Venice, Louisiana, in water nearly 5,000 feet deep.  At the time of the explosion, drilling was being conducted at over 22,000 feet — 2,000 feet deeper than allowed by federal permitting.

53.     The leak is spilling, by conservative estimates, over 5,000 barrels of petroleum — equivalent to over 200,000 gallons — into the Gulf of Mexico each day.  At the time of the commencement of this action, some estimates place the discharge at 25,000 barrels (or 1,100,000 gallons) per day.  According to BP's own prospectus filed with the MMS, if the pipe system at the rig eroded completely, the leakage could escalate to 163,000 barrels per day (6,800,000 gallons), a truly cataclysmic figure.

54.     At the time of the explosion, the rig was not producing any oil.  The rig had drilled a well in the sea floor and was in one of the last phases of the exploratory operation prior to turning the well into a production well.  In this final phase, Halliburton workers on the rig, under the supervision and control of BP employees, were attempting to create a cement seal to plug off the wellhead.  BP employees under the supervision and control of one or more of the Defendants had authority over the Halliburton workers to determine the type and amount of cement to be used.

55.     Cementing a wellhead, particularly in deep water, is delicate work that carries the

risk of a blowout, or an uncontrolled release of oil and/or natural gas from the well.  Indeed, Defendants knew that the work being performed at the Deepwater Horizon rig was especially risky.  In 2007, the MMS raised concerns about oil rig blowouts associated with the exact type of cementing work the rig was doing when it exploded.  This information was known or should have been known to Defendants and BP's Safety, Ethics and Environment Assurance Committee, which took no steps to act on it.

56.     Although blowouts due to other causes were on the decline, the MMS study noted that blowouts during cementing work were continuing with alarming regularity, and most frequently of all in the Gulf of Mexico.  Cementing was a factor in 18 of 39 well blowouts between 1992 and 2006.  Nearly all of the blowouts examined occurred in the Gulf.

57.     Halliburton was responsible for cementing a well off the coast of Australia that blew in August 2009, leaking oil for ten weeks before it was plugged.  The MMS is investigating that incident, and an MMS official has testified that a poor cement job likely caused the blowout. This information was known or should have been known to Defendants and BP's Safety, Ethics and Environment Assurance Committee, which took no steps to act on it.

58.     Moreover, a blowout preventer manufactured by Cameron and another company was the subject of a dispute between BP and Transocean in June 2000.  In that incident, BP issued a notice of default to Transocean concerning the functioning of one of Transocean's oil rigs, in which the blowout preventer was the subject of concern.  Defendant Hayward acknowledged the existence of this dispute in public comments on May 4, 2010. This information was known or should have been known to Defendants and BP's Safety, Ethics and Environment Assurance Committee, which took no steps to act on it.

59.     In addition, Defendants were aware of an August 2009 blowout in the Timor Sea,

which was found to have been caused by careless cementing work.  During that incident, which bears a strong resemblance to the Deepwater Horizon blowout, oil leaked from the site for ten weeks, spreading damage over 200 miles from the well site.  This information was known or should have been known to Defendants and BP's Safety, Ethics and Environment Assurance Committee, which took no steps to act on it.

60.    The threat of blowouts increases as drilling depth increases.  Deepwater Horizon was drilling in 5,000 feet of water, to a total depth in excess of 20,000 feet.  Defendants were well aware of the high risk of blowouts from such deep drilling.

61.    Not only did the blowout preventer on the Deepwater Horizon rig fail to stop the flow immediately after the explosion on the evening of April 20th, but repeated attempts to engage the blowout preventer in the days and weeks that followed similarly have been to no avail.  Worse, Defendants failed to install at least two pieces of back-up safety equipment that would have stopped the leak even without the blowout preventer.

62.    First, Defendants consciously elected not to install an acoustically activated remote-control shut-off valve, costing only $500,000, to the well.  Such acoustic switches are mandated in countries like Brazil and Norway, and are routinely employed by companies such as Royal Dutch Shell and Total SA, but have not been legally required in the U.S. due to the lobbying efforts of the Defendants themselves as well as their counterparts at other companies.

63.    Second, Defendants chose not to install a deep-water valve that would have been placed about 200 feet under the sea floor.  Much like blowout preventers, devices that are meant to seal leaks, this valve could have served as a cutoff of last resort in explosions.

64.    Defendants ignored these precautions despite being well aware of the increased risk, from deep-sea drilling, of a failure of the primary blowout safety mechanism, the blowout

preventer.  This information was known or should have been known to Defendants and BP's Safety, Ethics and Environment Assurance Committee, which took no steps to act on it.

65.     A 2004 study by federal regulators showed that blowout preventers may not function in deepwater drilling environments because of the increased force needed to pinch and cut the stronger pipes necessary to drill at such great depths.  Only three of 14 rigs studied had blowout preventers able to squeeze off and cut the pipe at the water pressures present at the equipment's maximum depth.  "This grim snapshot illustrates the lack of preparedness in the industry to shear and seal a well with the last line of defense against a blowout," the study said.  This information was known or should have been known to Defendants and BP's Safety, Ethics and Environment Assurance Committee, which took no steps to act on it.

66.     Due to the foregoing facts and circumstances, BP ADSs became an imprudent investment for Plan retirement savings, and it remains an imprudent investment today.  As set forth above, Defendants were responsible for the prudent management of Plan investments, including the BP ADS Fund.  A prudent fiduciary in like circumstances would have evaluated the foregoing and acted accordingly to protect the Plan from large losses.  Defendants failed to do so and are liable for that failure as set forth below.

## THE LAW UNDER ERISA

67.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

68.     ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such

breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

69. ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the Participants and beneficiaries, for the exclusive purpose of providing benefits to Participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

70. These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence, and are the "highest known to the law." They entail, among other things:

(a) the duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance the Plan, which invested in BP ADSs, to ensure that each investment is a suitable option for the Plan;

(b) the duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the Participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the Plan's sponsor; and

(c) a duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that

18

silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of Participants and beneficiaries.

71.     ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that ". . . [i]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 404(a)(l), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

72.     Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(l) and ERISA § 405(a).

### DEFENDANTS' FIDUCIARY STATUS

73.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(l), 29 U.S.C. § 1102(a)(l).

74.     During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A) and the law interpreting that section. As outlined herein, Defendants all had discretionary authority and control with respect to the

management of the Plan and/or the management or disposition of the Plan's investments and assets, and/or had discretionary authority or responsibility for the administration of the Plan.

75.     During the Class Period, Defendants' direct and indirect communications with the Plan's Participants included statements regarding investments in Company ADSs.   Upon information and belief, these communications included, but were not limited to, SEC filings, annual reports, press releases, Company presentations made available to the Plan's Participants via the Company's website and the plan-related documents which incorporated and/or reiterated these statements. Defendants also acted as fiduciaries to the extent of this activity.

76.     In addition, under ERISA, in various circumstances, non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable.  To the extent any of the Defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the breaches of fiduciary duty described below.

## CAUSES OF ACTION

## COUNT I

77.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

78.     At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

79.     As alleged above, Defendants were responsible, in different ways and to differing extents, for the selection and monitoring of the Plan's investment options, including the option of Company ADSs.

80.     Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that

investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in BP ADSs in the Plan were prudent and that such investment was consistent with the purpose of the Plan.  Defendants are therefore liable for losses incurred as a result of such investments being imprudent.

81.     A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

82.     Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to prevent the Plan, and indirectly the Plan's Participants and beneficiaries, from suffering losses as a result of the Plan's investment in BP ADSs.

83.     The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

84.     Defendants breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the failure to prudently and loyally manage the Plan's assets with respect to offering Company ADSs as an investment

option in the Plan; enabling Defendants' failure to prudently manage the Plan's assets with respect to the Plan's investments; and, having knowledge of the failure to prudently manage the Plan's assets, yet not making any effort to remedy the breach.

85.    Specifically, at least some of the Defendants had actual knowledge of BP's questionable reporting and business.  In addition, in light of their high-ranking positions as high ranking officers at the Company, Defendants had/should have had constructive knowledge of these activities.

86.    Despite this knowledge, Defendants participated in each other's failures to prudently manage the Plan's assets and knowingly concealed such failures by not informing Participants that the Plan's holdings of BP ADSs were not being prudently managed.  They also failed to remedy their mutual breaches of the duty to prudently manage the Plan's investment in BP ADSs, despite inarguably having knowledge of such breaches.

87.    Furthermore, through their own failure to prudently and loyally manage the Plan's investment in BP ADSs, or to undertake any genuine effort to investigate the merits of such investment, or to ensure that other fiduciaries were doing so, Defendants enabled their co-fiduciaries to breach their own independent duty to prudently and loyally manage the Plan's investment in BP ADSs.

88.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their investments meant to help Participants save for retirement.  Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

89.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

90.     At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

91.     As alleged above, the scope of Defendants' fiduciary duties and responsibilities included disseminating the Plan documents and information to Participants regarding the Plan and assets of the Plan.   In addition, Defendants had a duty to provide Participants with information they possessed that they knew or should have known, would have an extreme impact on the Plan.

92.     The duty of loyalty under ERISA requires fiduciaries to speak truthfully to Participants, not to mislead them regarding the Plan or the Plan's assets, and to disclose information that Participants need in order to exercise their rights and interests under the Plan. This duty to inform Participants includes an obligation to provide Participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate material information regarding the Plan's investment options such that Participants can make informed decisions with regard to investment options available under the Plan, this duty applies to all of the Plan's investment options, including investment in BP ADSs.

93.     Defendant BP, through its officers and directors issued a multitude of inaccurate statements through SEC filings and press releases regarding value of BP ADSs and the financial health of the Company.

94.     Upon information and belief, such communications were disseminated directly to all Participants, which incorporated by reference the Company's inaccurate SEC filings and reports furnished by BP, through its officers.   In addition, upon information and belief, the

Company communicated directly with all Participants regarding the merits of investing in BP ADSs in company-wide and uniform communications, and, yet, in the context of such communications failed to provide complete and accurate information regarding BP ADSs as required by ERISA.

95.     In addition, Defendants were responsible for providing Participants in the Plan with investment education and communication.  Defendants, however, failed to disclose any information to the Plan Participants regarding BP's deceitful business practices and how these activities adversely affected Company ADSs as a prudent investment option under the Plan. Defendants thus breached their duty to provide Participants with complete and accurate information necessary for making informed investment decisions with regard to investment options under the Plan.

96.     Defendants breached their duty to inform Participants by failing to provide complete and accurate information regarding BP ADSs, making material misrepresentations about the Company's financial condition, and, generally, by conveying inaccurate information regarding the soundness of BP ADSs and the prudence of investing retirement contributions in the Company's stock.

97.     These failures were particularly devastating to the Plan and the Participants, as a certain percentage of the Plan's assets were invested in BP ADSs during the Class Period and, thus, the stock's precipitous decline had an enormous impact on the value of Participants' retirement assets.

98.     In addition, BP and the other defendants knew or should have known that information they possessed regarding the true condition of BP would have an extreme impact on

the Plan. Yet, in violation of their fiduciary duties, these Defendants failed to provide Participants with this crucial information.

99. As a consequence of the failure of Defendants to satisfy their disclosure obligations under ERISA, Participants lacked sufficient information to make informed choices regarding investment of their retirement savings in BP ADSs, or to appreciate that under the circumstances known to the fiduciaries, but not known by Participants, BP ADSs was an inherently unsuitable and inappropriate investment option for their plan accounts. Had accurate information been provided, Participants could have protected themselves against losses accordingly, and consequently, Participants relied to their detriment on the incomplete and inaccurate information provided by Defendants in their fiduciary communications and failures thereof.

100. As a consequence of Defendants' breaches of fiduciary duty alleged in this Count, the Plan suffered tremendous losses. If Defendants had discharged their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the other Class members, lost millions of dollars of retirement savings.

101. Pursuant to ERISA §§ 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III

102. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

103.    At all relevant times, as alleged above, BP and defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  At all relevant times, as alleged above, the scope of the fiduciary responsibilities of BP and defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries.  The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.

104.    The monitoring fiduciaries, BP and defendants had the duty to:

(a)    Ensure that the appointed the Plan fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, as noted above, and the behavior of the Plan's Participants;

(b)    Ensure that the appointed Plan fiduciaries are provided with adequate financial resources to do their job;

(c)    Ensure that the appointed Plan fiduciaries have adequate information to do their job of overseeing the Plan's investments;

(d)    Ensure that the appointed Plan fiduciaries have ready access to outside, impartial advisors when needed;

(e)    Ensure that the appointed Plan fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and

(f)    Ensure that the appointed Plan fiduciaries report regularly to the Company, the Company must then review, understand, and approve the conduct of the hands-on fiduciaries.

105.     Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.   In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

106.     BP and defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the appointed Plan fiduciaries were given adequate information about the Company's business problems alleged above, which made Company ADSs an imprudent investment, which was necessary for them to perform their duties of overseeing the Plan's investments, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment by rank and file employees in an undiversified employer stock fund which was made up primarily of Company ADSs, an investment that was imprudent and inherently subject to significant downward movements, especially here where the stock was artificially inflated by non-public corporate malfeasance and illicit activities.

107.     BP and defendants also breached this duty by not properly disclosing information, that they knew or should have known, about the Company's improper business practices to the Trustee.  The Trustee is responsible for investing and managing assets of the Plan.  However, in doing so, the Trustee shall be subject to the direction and guidance of BP.

108.     BP and the other defendants knew or should have known that the fiduciaries they were responsible for monitoring were (a) imprudently allowing the Plan to continue offering BP

ADSs as an investment alternative for the Plan, and (b) continuing to invest the assets of the Plan in BP ADSs when it no longer was prudent to do so. Despite this knowledge, BP and defendants failed to take action to protect the Plan, and concomitantly the Plan's Participants, from the consequences of these fiduciaries' failures.

109.    BP and defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the appointed Plan fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

110.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their investments meant to help Participants save for retirement.

111.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C., § 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

112.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

113.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

114.    ERISA § 404(a)(l)(A), 29 U.S.C. § 1104(a)(l)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the Participants and beneficiaries and for the exclusive purpose of providing benefits to Participants and beneficiaries.

115.    Given the allegations listed above, Defendants clearly placed the interests of themselves and the Company, as evidenced by the longstanding artificial inflation of Company ADSs, before the interests of the Plan and its Participants and beneficiaries.  These conflicts of interest put Defendants in the inherently problematic position of having to choose between their own interests as directors, officers, executives (and BP ADS holders), and the interests of the Plan's Participants and beneficiaries, in whose interests Defendants were obligated to loyally serve with an "eye single."

116.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investment in BP ADSs; failing to notify appropriate federal agencies, including the SEC of the facts and transactions which made BP ADSs an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company and themselves above the interests of the Participants with respect to the Plan's investment in Company ADSs.

117.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT V

118.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

119.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary

29

responsibility of another fiduciary with respect to the same plan if (a) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (b) he fails to comply with § 1104(a)(l) in the administration of his specific responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (c) he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

120.    As alleged herein, BP, through its officers and employees withheld material information from the Plan's Participants and provided inaccurate disclosures, by the conduct set forth above, and profited from such practices, and, thus, knowledge of such practices is imputed to these defendants as a matter of law.  In addition, as alleged herein on information and belief, BP and the other defendants participated in and/or knew about the Company's misrepresentations regarding the Company's financial condition.  Thus, these defendants as well had knowledge at all relevant times of the factual matters pertaining to the imprudence of BP ADSs as an investment for the Participants' retirement assets.

121.    Despite this knowledge, Defendants knowingly participated in their co-fiduciaries' failures to prudently and loyally manage the Plan's investment and holding of BP ADSs during the Class Period.  They did so by themselves making imprudent and disloyal decisions respecting the Plan's investment in BP ADSs in the manner alleged herein in violation of ERISA § 405(a)(l)(A).  In addition, these same defendants failed to undertake any effort to remedy their co-fiduciaries' and one-another's failures to prudently and loyally manage the Plan's investment in BP ADSs despite knowing such failures were breaches of fiduciary duty under ERISA.  Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(l)(C).

122.    In further violation of ERISA § 405(a)(l)(C), Defendants also knew that inaccurate and incomplete information had been provided to Participants, yet, they failed to undertake any effort to remedy this breach by ensuring that accurate disclosures were made to Participants and the market as a whole.  Instead, they compounded the problem by downplaying the significance of BP's problems and further concealing such practices from Participants and the market as a whole.

123.    In addition, Defendants enabled the imprudent asset management decisions of any and all other defendant -- including any appointed plan fiduciaries -- who lacked knowledge of the circumstances rendering the stock imprudent, by failing to provide such persons with complete and accurate information regarding the stock, or to the extent all such persons possessed the information, by failing to ensure that they appreciated the true risks to the Plan caused by the Company's improper practices, so that these other defendants could effectively discharge their obligation to prudently and loyally manage the Plan's investment in BP ADSs. In so doing, Defendants breached ERISA § 405(a)(l)(B).

124.    Further, through their failure to properly and effectively monitor and remove those fiduciaries whose performance was inadequate as alleged above, Defendants enabled these appointed plan fiduciaries' imprudent management of the BP ADSs in the Plan.

125.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their retirement investment.

126.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT VI

127.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

128.    To the extent that BP is found not to have been a fiduciary or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, BP knowingly participated in the breaches of those defendants who were fiduciaries and acted in a fiduciary capacity and as such is liable for equitable relief as a result of participating in such breaches.

129.    BP benefited from the breaches by discharging its obligations to make contributions to the Plan in amounts specified by contributing BP ADSs  to the Plan while the value of the stock was inflated as the result of the breaches of fiduciary duty alleged herein and as a result of BP providing the market with materially inaccurate statements and omissions. Accordingly, BP may be required to disgorge this benefit or a constructive trust should be imposed on treasury shares of BP ADSs which would have been contributed to the Plan, but for BP's participation in the foregoing breaches of fiduciary duty.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for:

A.    A declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.    A declaration that Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(l)(B), 29 U.S.C. § 1104(c)(l)(B);

C.    An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits

Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if Defendants had fulfilled their fiduciary obligations;

D.      Imposition of a constructive trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.      An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.      An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in BP ADSs;

G.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts as benefits due in proportion to the accounts' diminution in value;

H.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.      An Order for equitable restitution and other appropriate equitable monetary relief against Defendants

Dated:  August 5, 2010

**FUTTERMAN, HOWARD, ASHLEY
WATKINS & WELTMAN, P.C.**

By:     /s/  Charles R. Watkins
        Charles R. Watkins, Esq.
        122 S. Michigan Avenue
        Suite 1850
        Chicago, IL 60603
        Tel: (312) 427-3600
        Fax: (312) 427-1850
        Email: cwatkins@futtermanhoward.com

Thomas J. McKenna, Esq.
**GAINEY & McKENNA**
295 Madison Avenue, 4th Floor
New York, New York 10017
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmlaw2001@yahoo.com
        tjmckenna@gaineyandmckenna.com